**Electronically Filed
Intermediate Court of Appeals
30227
29-JUL-2011
08:20 AM**

NO. 30227

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
LESLIE MICHAEL DABIS, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 07-1-342)


MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

Defendant-Appellant Leslie Michael Dabis (Dabis) appeals from the Judgment filed on December 2, 2009 in the Circuit Court of the Third Circuit (circuit court).[1] Following a trial, the jury found Dabis guilty of the following offenses: Promoting a Dangerous Drug in the Third Degree, in violation of Hawaii Revised Statutes (HRS) § 712-1243(1)[2] (Count I); Attempted Methamphetamine Tracking in the Second Degree, in violation of

---

[1] The Honorable Greg K. Nakamura presided.

[2] HRS § 712-1243 (Supp. 2006) provides: "**Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

HRS §§ 705-500(1)(b)[3] and 712-1240.8(1)[4] (Count II); Prohibited Acts Related to Drug Paraphernalia, in violation of HRS § 329-43.5[5] (Count XI); Driving without a License, in violation of HRS § 286-102(b)[6] (Count XIV); and Reckless Driving of Vehicle, in violation of HRS § 291-2[7] (Count XVI).[8]

---

[3] HRS § 705-500(1)(b) (1993) provides, in pertinent part:

> **Criminal Attempt.** (1) A person is guilty of an attempt to commit a crime if the person: . . . (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

[4] HRS § 712-1240.8 (Supp. 2006) provides, in pertinent part, as follows: "**Methamphetamine trafficking in the second degree.** (1) A person commits the offense of methamphetamine trafficking in the second degree if the person knowingly distributes methamphetamine in any amount."

[5] HRS § 329-43.5(a) (1993) provides, in pertinent part:

> **Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706-660 and, if appropriate as provided in section 706-641, fined pursuant to section 706-640.

[6] HRS § 286-102(b) (Supp. 2006) (**Licensing**) provides: "A person operating the following category or combination of categories of motor vehicles shall be examined as provided in section 286-108 and duly licensed by the examiner of drivers: (1) Mopeds; (2) Motorcycles and motor scooters; (3) Passenger cars of any gross vehicle weight rating . . . ."

[7] HRS § 291-2 (Repl. 2007) provides:

> **Reckless driving of vehicle or riding of animals; penalty.** Whoever operates any vehicle or rides any animal recklessly in disregard of the safety of persons or property is guilty of reckless driving of vehicle or reckless riding of an animal, as appropriate, and shall be fined not more than $1,000 or imprisoned not more than thirty days, or both.

[8] The jury found Dabis not guilty as to two counts of prohibited acts related to drug paraphernalia and one count of promoting a dangerous drug in
(continued...)

2

Prior to trial, on November 23, 2007, Dabis filed a "Motion to Suppress Evidence and Statements," arguing *inter alia* that the police did not have sufficient reliable information or specific and articulable facts to support their stop and seizure of him. Dabis therefore asserted that evidence obtained from his seizure should be suppressed. After hearings on February 20, 2008, February 28, 2008, and March 27, 2008, the circuit court entered "Findings of Fact and Conclusions of Law Denying Defendant's Motion to Suppress Evidence and Statements" (Findings and Conclusions) on May 13, 2008.

On appeal, Dabis contends that the circuit court erred in denying his motion to suppress evidence.

We hold that the circuit court did not err in denying Dabis's motion to suppress, but we do so on grounds different than those stated by the circuit court.

## I.    STANDARDS OF REVIEW

"A trial court's ruling on a motion to suppress evidence is reviewed *de novo* to determine whether the ruling was 'right' or 'wrong.'" State v. Spillner, 116 Hawaiʻi 351, 357, 173 P.3d 498, 504 (2007) (quoting State v. Kaleohano, 99 Hawaiʻi 370, 375, 56 P.3d 138, 143 (2002)). "The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from

---

[8](...continued)
the third degree. The jury was unable to come to a unanimous verdict as to the other counts, but before a retrial was held on those counts, Dabis entered a "no contest" plea to Count IV, which had been reduced to promotion of a dangerous drug in the second degree (a lesser included offense of the original charge). As part of the plea agreement, the State agreed to dismiss the remaining mis-tried charges.

Dabis was sentenced to concurrent terms of imprisonment of five years for Count I, ten years for Count II, ten years for Count IV, five years for Count XI, and thirty days for each of Counts XIV and XVI. Defendant Dabis was ordered to serve a mandatory minimum term of one year for Count II pursuant to HRS § 712-1240.8.

unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution." Id. (citation omitted.)

"The circuit court's conclusions of law underlying its ruling on a motion to suppress are also reviewed de novo under the right/wrong standard." State v. Vinuya, 96 Hawai'i 472, 480, 32 P.3d 116, 124 (App. 2001). The trial court's findings of fact are reviewed under the clearly erroneous standard and as such "will not be set aside on appeal unless . . . determined to be clearly erroneous." Id. (citations omitted).

> Furthermore,
>
> when the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.

Id. at 481, 32 P.3d at 125 (quoting State v. Kong, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App. 1994)).

II. **CASE BACKGROUND**

A. **Statement of Facts**

This case arose out of an incident that occurred on July 9, 2007, in Hilo, Hawai'i.[9] Officer Brian Prudencio (Officer Prudencio), who was assigned to the Hilo Vice Section Ice Task Force Unit of the Hawai'i County Police Department, obtained information from a person he identified as a reliable confidential informant. In an affidavit dated the same day as the incident and supporting a search warrant in this case, Officer Prudencio attested that he spoke with the informant within five days prior to the incident "concerning

---

[9] This factual summary is taken from the record and from the findings of fact made by the circuit court in denying Dabis's motion to suppress. Dabis does not challenge any of the findings of fact by the circuit court.

methamphetamine distribution involving a male individual known only as 'Les'." The informant told Officer Prudencio that "Les" was Filipino, was not from the Big Island, and that "Les" had been frequently coming to Hilo from either Maui or Honolulu to sell methamphetamine. The informant further stated that "'Les' is operating a beige colored sedan and that he frequents various areas in Hilo to sell methamphetamine." The informant told Officer Prudencio that "Les" keeps packaged methamphetamine with him at all times in his pockets or within the vehicle he is operating.

Officer Prudencio's affidavit also sets forth the basis for his belief that the informant is reliable. He states that the informant had assisted police on "more than three occasions regarding drug purchases and information concerning possession and distribution of methamphetamine in the past which resulted in the recovery of methamphetamine." Officer Prudencio's affidavit also states that information received from the informant in the past had "resulted in the recovery of methamphetamine through controlled purchases which resulted in a search warrant and recovery of methamphetamine at the direction of your affiant." The affidavit further provides that the informant "related against his/her penal interest to having become acquainted with the physical characteristics of methamphetamine through having been a past user," and related that he/she is familiar with the ways methamphetamine is ingested, weighed and distributed.

Officer Prudencio's affidavit then sets out the information he received on the day of the incident as follows:

> That on July 09, 2007, at 1610 hours, your affiant, received information from a reliable confidential informant that "Les" would be conducting a drug transaction that was set to take place within the parking lot of the Kawailani Pizza Hut parking lot, on the corner of West Kawailani Street and Kinoole Street. With the information related from the reliable confidential informant, your affiant proceeded to conduct checks at the described location.

5

Although Officer Prudencio describes the information received on this date as being "from a reliable confidential informant," it is not clear from the record whether it was the same informant from whom he had previously received information about "Les."

At approximately 4:20 p.m. on July 9, 2007, about ten minutes after contact with the informant that day, Officer Prudencio and several other officers arrived at the Kawailani Pizza Hut in an unmarked, eight-passenger white van. The van reversed into a parking stall facing Kinoole Street to survey the area.

A short time later, from his vantage point in the van, Officer Prudencio saw a sedan which could be characterized as beige or gold in color enter the parking lot. The driver of the sedan was a male of Filipino descent (later identified as Dabis) and the driver reversed into a parking stall next to another vehicle. Officer Prudencio observed a female passenger seated next to the driver, and she got out of the sedan and approached the other vehicle. Officer Prudencio had the driver of the police van drive closer to the sedan and he observed that the sedan's driver was looking around as if he were "keeping a watchful eye." Based on these observations, Officer Prudencio suspected that a drug deal was taking place.

Officer Prudencio directed the driver of the police van to stop in front of the sedan. The police van drove to a spot between some gas pumps and the parking stalls, so that it partially blocked the sedan and formed a "T" shape. Officer Prudencio exited the van and could hear the sedan's engine running, could see Dabis looking around the parking lot, and saw Dabis was "moving and from the upper body up, and it got very fast, quick, uh paced . . . arms moving."

Officer Prudencio approached the front of the sedan. He was wearing his "battle dress uniform," which is a military-

6

style uniform consisting of blue pants, a blue long-sleeve buttoned shirt reading "police" on the back, a police patch on the left arm, and a police badge hanging from his neck to the front chest area.  As Officer Prudencio was in front of the sedan and attempting to approach the driver's side, the sedan started to move forward out of the stall.  The sedan could not go around both the van and Officer Prudencio.  Officer Prudencio then drew his gun and pointed it at the driver, testifying that "at that time, I felt that the vehicle was deadly force coming to me so at the same time for my safety as well as the safety for individuals in the area, I drew my weapon."

After Officer Prudencio drew his firearm, Dabis reversed the sedan over the parking lot curb and down a grassy embankment before the sedan collided into two utility poles. Officer Prudencio followed the car down the embankment, yelling "Stop.  Police."

At the bottom of the slope, Officer Prudencio saw Dabis jump into the back seat of the sedan and try to exit through a back passenger door.  Officer Prudencio yelled at the defendant to stop and to unlock the car doors.  Another officer, Officer Weber, used a collapsible baton to break the passenger window, and Officer Paul Fukuda (Officer Fukuda) reached in and unlocked the door.  Dabis and another male were found in the back seat of the car.

After all the parties were secured, Officer Prudencio asked Dabis for consent to search the sedan, which Dabis refused.[10]  During the time the police took action regarding the motor vehicle accident, Officer Fukuda, a narcotic canine handler who had been in the police van, conducted a canine screen for

_____

[10]  An investigation revealed that the sedan was registered to "Rodney Miyazono," who told the police that he had lent the car to Leimomi Melendez, his "sort of girlfriend," and that he had no belongings in the vehicle. Melendez in turn lent the car to Dabis.

drugs in the sedan.  The canine alerted to the odor of a controlled substance in the sedan.

Dabis was arrested for not having a driver's license and for possession of a controlled substance.  Officer Fukuda conducted a pat-down search of Dabis's person, which recovered U.S. currency.

That same day, Officer Prudencio prepared his affidavit and requested a search warrant to search the sedan.  The search warrant was issued and a search of the vehicle was conducted several hours later in the sally port of the Hilo Police Station. Drugs and drug paraphernalia were recovered during the search.

### B.    Circuit Court Ruling

In its Findings and Conclusions, the circuit court concluded that Dabis was seized when Officer Prudencio drew his firearm and pointed it at Dabis, but that the facts at that point "do not rise to the level of specific and articulable facts indicating that criminal activity was afoot."  The circuit court thus concluded that the initial detention of Dabis, at the point Officer Prudencio pointed his firearm, was illegal.

However, the circuit court further concluded that, because of Dabis's subsequent illegal conduct, the police had probable cause to detain him to investigate the offenses of driving without a license, reckless driving of a vehicle, and obedience to police officers.  The circuit court then reasoned that, during the time Dabis was validly detained for investigation, the canine screen was done and that probable cause existed for the search warrant to be issued.  The circuit court therefore denied the motion to suppress evidence.

### III. DISCUSSION

Dabis contends on appeal that the circuit court "erred in not suppressing the evidence seized from the unconstitutional and illegal stop of the Appellant on July 9, 2007."

8

Both the United States and Hawai'i Constitutions provide protection against unreasonable searches and seizures. "We presume that a warrantless search or seizure is invalid unless and until the prosecution proves that the search or seizure falls within a well-recognized and narrowly defined exception to the warrant requirement." State v. Prendergast, 103 Hawai'i 451, 454, 83 P.3d 714, 717 (2004) (citation omitted).

> In connection with the established guidelines, [i]t may be stated . . . that the intrusion upon personal liberty must be based on something more substantial than inarticulate hunches, and that reasonableness would be judged by an objective standard, namely, whether the facts known by the officer would warrant a man of reasonable caution to believe that the action taken was appropriate.

State v. Onishi, 53 Haw. 593, 596, 499 P.2d 657, 659 (1972).

In this case, the initial approach by the police toward Dabis was for investigatory purposes. "A law enforcement officer may 'in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" State v. Ward, 62 Haw. 459, 461, 617 P.2d 565, 566 (1980) (per curium) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).

> To justify an investigative stop, short of arrest based on probable cause, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate.

State v. Bohannon, 102 Hawai'i 228, 237, 74 P.3d 980, 989 (2003) (citations, brackets and quotation marks omitted). We consider the "totality of the circumstances" in determining whether reasonable suspicion supported a stop. See Spillner, 116 Hawai'i at 357, 173 P.3d at 504.

A.    Seizure of Dabis

As an initial matter, we hold that Dabis was "seized" within the meaning of the fourth amendment when the unmarked police van stopped in front of the car Dabis was occupying and Officer Prudencio, wearing police "battle dress uniform," approached the vehicle from the front. At that point, Dabis's vehicle was blocked in the parking stall by the van and Officer Prudencio. See Terry, 392 U.S. at 20 n.16 (explaining that a person is seized "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."); State v. Tsukiyama, 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974) ("In order to determine if the defendant's liberty was restrained and he was, therefore, seized, we must evaluate the totality of the circumstances and decide whether or not a reasonably prudent person would believe he was free to go.").

Under the totality of the circumstances, a reasonable person in Dabis's situation would not have felt that he or she was free to leave, where both the van and Officer Prudencio blocked Dabis's car. When Dabis started to move his vehicle forward, Officer Prudencio then pulled out his gun and pointed it at Dabis in self-protection.[11]

Having determined that Dabis was "seized" at the point of being blocked into the parking stall, we turn to the issue of whether the police had reasonable suspicion of criminal activity at that time to make such a seizure constitutional.

_____

[11] We note that under the circumstances, Officer Prudencio's drawing of his pistol did not constitute an "arrest." Rather, it was a reasonable self-protective measure. See State v. Goudy, 52 Haw. 497, 502-04, 479 P.2d 800, 803-04 (1971) ("[U]nder similar circumstances, the mere approach with drawn pistols upon persons stopped for questioning is not an arrest."). Here, although there was no evidence that Dabis was carrying a weapon, Dabis was suspected of drug dealing and the sedan moved forward toward Officer Prudencio. Under these circumstances, the officer's drawing of his gun was reasonable.

B.    Reasonable Suspicion for An Investigatory Stop

As noted above, the record is not clear whether the same informant was involved both prior to and on the day of the incident.  To the extent that it was the same informant that provided information to Officer Prudencio within days of the incident and on the day of the incident -- in other words, one informant who had reliably assisted police on three prior occasions -- that factor would provide added reliability to the information known to police to support the stop of Dabis.  See Ward, 62 Haw. at 461, 617 P.2d at 567 (court noted as one factor that confidential informant was known to police officer and had provided reliable information in the past).

Even if we assume, arguendo, that there were two informants and only the first informant had provided reliable information in the past, the totality of the circumstances in this case support the conclusion that the investigatory stop of Dabis was warranted.  That is, even if there was a second informant that provided the information on the day of the incident, under an objective standard, the totality of the circumstances in this case includes the information provided prior to the day of the incident and the more specific information provided on the day of the incident, in conjunction with Officer Prudencio's corroborating observations at the scene in the Kawailani Pizza Hut parking lot a short time after contact with the second informant.

The Hawaiʻi Supreme Court has decided cases involving investigatory stops based in part on information from known confidential informants, as well as cases involving anonymous tips.  Based on these cases, we must consider whether the information provided by the informant(s) was sufficiently reliable or whether "other factors tending to corroborate the defendant's involvement in criminal activity are present."  State

v. Temple, 65 Haw. 261, 271, 650 P.2d 1358, 1364-65 (1982); see also Ward; State v. Joao, 55 Haw. 601, 525 P.2d 580 (1974); State v. Kuahuia, 62 Haw. 464, 616 P.2d 1374 (1980); State v. Kea, 61 Haw. 566, 606 P.2d 1329 (1980) (per curium); Goudy.

### (1) Relevant Hawai'i Case Law Involving a Known Confidential Informant

Where the informant is known to law enforcement, courts have considered whether that person has provided reliable information in the past, or whether there is an adequate factual basis that the person is a reliable informant. Ward, 62 Haw. at 461, 617 P.2d at 566-67; Joao, 55 Haw. at 605, 525 P.2d at 583; Temple, 65 Haw. at 270, 650 P.2d at 1364 ("The informant was known to [the officer] personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip.") (quoting Adams v. Williams, 407 U.S. 143, 146-47 (1972)).[12]

Ward and Joao are cases where the informant was known to law enforcement. The informant in Ward had provided reliable information in the past, but there was no similar evidence in Joao. Given these factors, plus the corroborating information (or lack thereof) in the respective cases, the investigative stop was upheld in Ward but not in Joao.

In Ward, the court held that a reliable confidential informant's tip "was sufficiently corroborated by the officers' observations to warrant a limited investigatory stop." 62 Haw. at 461, 617 P.2d at 566. There, an officer received a call from a confidential informant, whom he personally knew and who had provided reliable information in the past. The informant stated that:

---

[12] In the context of an investigatory stop, the information from an informant need not be of the same caliber as is required to support the higher standard for probable cause. See Ward, 62 Haw. at 461, 617 P.2d at 566.

> Jeff Kealoha and another person . . . were on their way to
> the IBEW Union Hall on Hau Street in a late model Cutlass
> automobile bearing license number 6C87; that they were the
> two individuals who had been in an altercation earlier with
> union leader, Josiah Lii; that they had three machine guns
> in the trunk of their car; and that they were probably
> carrying firearms on their persons.

Id. at 460, 617 P.2d at 566.  The court noted that "[h]ow and in what manner the informant obtained this information is not shown by the record."  Id.  Upon receiving the tip, the officers drove to the union hall and set up a surveillance of the area.  Id. Approximately 45 minutes after receiving the informant's call, the suspect car drove into the parking lot, and two men stepped out; one of whom an officer recognized to be Jeff Kealoha.  Id. At that point:

> There was nothing unusual or suspicious about
> Kealoha's appearance or behavior.  The agent noticed,
> however, that the other man, the defendant, had a bulge
> under his shirt at the right hip area. [The agents] drove
> into the parking lot and as they approached the two men, the
> officers saw the defendant looking at them while appearing
> to adjust the bulge under his shirt.  The agents came to a
> stop near the two and alighted from their vehicle with guns
> drawn.  They ordered Kealoha and the defendant to place
> their hands against the car and conducted a frisk of their
> persons.  The object causing the bulge under the defendant's
> shirt was revealed by the search to be a revolver.

Id. at 460-61, 617 P.2d at 566.

The court determined that the investigative stop was warranted where "the substance of [the informant's] tip was very specific and was adequately anchored as to time and place" and where "the agents acted promptly upon the information and their observations coincided in verifiable respects with their informant's tip."  Id. at 461, 617 P.2d at 567.

In Joao, the court affirmed suppression of an automatic pistol recovered from a stop and frisk based on a confidential informant's tip.  There, the informant told an officer that a person named "Walter Joao was carrying a .22 caliber automatic pistol and that he carried it with him whenever he's in Waikiki

and traveling around in the town area." Id. at 602, 525 P.2d at 581-82. The police observed nothing unusual or suspicious about Joao's conduct prior to frisking him and attempted to justify their actions based on the informant's tip. Id. at 603-04, 525 P.2d at 582-83. The court stated that because the informer's tip lacked "an adequate anchor, as to time and place, the reliability of this information [was] greatly attenuated." Id. at 604, 525 P.2d at 582-83. Furthermore, although the officer testified that the informant was "reliable," his testimony merely stated this factor as a conclusion rather than asserting the factual basis upon which another person could draw this conclusion. Id. at 604, 525 P.2d at 583. Also, importantly, the Joao court noted that the informant's tip was the "sole justification for the stop and frisk" in that case. Id. at 604, 525 P.2d at 583.

Assuming *arguendo* there were two informants in the instant case, the totality of the circumstances lie somewhere between Ward and Joao, but are more similar to Ward. That is, both informant(s) were known to Officer Prudencio and there is evidence that the first informant had provided reliable information in the past; the first informant provided general information about "Les", similar to the tip in Joao, but the information from the second informant was more specifically anchored by time and place; the police acted promptly upon receiving the more specific information from the second informant; and the information provided by the informant(s) was not the only justification for the stop because Officer Prudencio was able to corroborate details provided by the informant(s) and observed conduct he reasonably believed to be consistent with the anticipated drug deal.

### (2) Hawai'i Case Law Involving an Anonymous Tip

Although this case deals with confidential informant(s) known to Officer Prudencio, case law involving anonymous tips are

also instructive. That is, even when an informant is an anonymous person, the Hawai'i Supreme Court has held there may be sufficient basis to warrant an investigatory stop. See Goudy; Kea; Kuahuia.

The decision in Goudy is particularly helpful to our analysis. In Goudy, a police sergeant received an anonymous telephone call that a transaction involving a gun and jewelry was about to take place at 127 Oneawa Street in Kailua, that the buyer would be driving a black Barracuda automobile, and that the passenger in the Baracuda would be the contact man to obtain the articles. There was no description provided about the individuals to be involved. The sergeant went to Kailua to check the address, but no house existed with that address. Id. However, he and another detective kept watch on Oneawa Street and, about an hour after receiving the anonymous call, observed a black Barracuda on Oneawa driving toward Kaneohe. Id. The officers followed the car and observed the defendant get out of the car, enter a nearby lane, return with a beige-colored case that appeared to contain a rifle, place the case into the car, go back into the house, and return to the car with a brown paper sack. Id. at 488-499, 479 P.2d at 801-802. After the car began to head back towards Kailua, the police signaled the Barracuda to pull over. Id. at 499, 479 P.2d at 802. "Up to this point, there was nothing furtive in the actions of Kaaku and defendant, and nothing to arouse any suspicion of criminal activity, except for substantial dovetailing of police observations with the information given in the anonymous telephone call." Id. The officers approached the car with pistols drawn and ordered the two occupants out of the car. During their approach to the car, the officers saw the butt end of a rifle sticking out from a case in the back seat. Upon opening the door, one officer also saw

the butt end of a pistol on the floor. Id. at 499-500, 479 P.2d at 802.

The court concluded that while the anonymous phone call standing alone did not justify an arrest or search, "the call was a factor in the totality of circumstances which made the decision of [the officers] to stop the Barracuda and approach its occupants for questioning reasonable." Id. at 501, 479 P.2d at 803. The court noted that the tip involved possible traffic in firearms. Further, the court stated it would have been poor police work for the officers not to have stopped the Barracuda for questioning when "upon surveillance, they observed facts which substantially corroborated the information in the telephone call. The observed facts might have been consistent with lawful activity. But they were also consistent with possible criminal activity." Id. at 502, 479 P.2d at 803. The court held that the stop was reasonable.

Here, assuming arguendo that there were two informants, the totality of the circumstances involved information provided by known confidential informant(s), evidence as to the past reliability of one of the informant(s), the observations by Officer Prudencio -- at the specific location identified by the second informant just a short time before -- that corroborated information from the informant(s), and the observations of Officer Prudencio that he reasonably believed were consistent with a drug transaction. The information provided by the first informant, who had previously given reliable information to Officer Prudencio, included that "Les" operated a beige colored sedan and that he frequented various areas in Hilo to sell methamphetamine. On the date of the incident, the other informant provided further specific information, that "Les" would be conducting a drug transaction that "was set to take place within the parking lot of the Kawailani Pizza Hut parking lot, on

the corner of West Kawailani Street and Kinoole Street." Moreover, based on photographs and testimony in the record, the Kawailani Pizza Hut parking lot is of limited size and consists mainly of one row of eight or nine stalls.

Although the supreme court has warned that "[m]ere confirmation of innocent static details in an anonymous tip does not constitute corroboration" for purposes of determining probable cause, State v. Detroy, 102 Hawaiʻi 13, 20, 72 P.3d 485, 492 (2003) (citing United States v. Clark, 31 F.3d 831, 834 (9th Cir. 1994)), such factors can be considered in the totality of the circumstances to support reasonable suspicion for an investigatory stop. As noted in Goudy, "given a state of facts, which separately may appear innocent but which taken together would warrant investigation, it would be poor police work to fail to make further investigation." Goudy, 52 Haw. at 501, 479 P.2d at 803 (citing Terry v. Ohio, 392 U.S. 1 (1968)).

Here, the details as given by the informant(s) substantially dovetailed with the observations of Officer Prudencio at the scene. Officer Prudencio observed a Filipino male driving a beige or gold sedan pull into the specific location given by the second informant just a short time after the information was received. Other observations by Officer Prudencio, although taken separately perhaps innocent conduct, reasonably added to his belief under the totality of the circumstances that a drug transaction was occurring.[13] First, upon arriving at the parking lot, the sedan reversed into a stall next to another vehicle. Second, a female passenger in the sedan got out and approached the other vehicle. Officer Prudencio stated that this aroused his suspicions because the vehicle and

---

[13] At the time of the incident, Officer Prudencio had been a police officer for approximately seven years, had received special training in drug investigations, and had conducted in excess of fifty investigations involving illegal drugs and controlled substances.

operator matched the description from the confidential informant and "through my training and experience in conducting [surveillance] of drug transactions, distributors at times reverse into [their] stall so they can obtain easier exit, faster exit, as to not [be] in one area long enough to be detected by police or by concerned citizens who may report their activity[.]" Officer Prudencio also reported that he found the female exiting the sedan and approaching the other vehicle to be suspicious based on his training and experience conducting surveillance of drug transactions. According to Officer Prudencio, it is common in drug transactions that a vehicle will park and occupants will exit the vehicle to approach another individual or another vehicle to carry currency or narcotics.

Officer Prudencio also observed Dabis "looking around as if to be keeping a watchful eye." The Supreme Court has noted that "nervous, evasive behavior can be a pertinent factor in determining reasonable suspicion" especially when it is "unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion." State v. Estabillio, 121 Hawai'i 261, 274, 218 P.3d 749, 762 (2009) (citation omitted). Here, although the described actions do not appear to have been "unusually severe or persistent," they were accompanied by other grounds supporting reasonable suspicion.

Taken together, the totality of the circumstances in this case made the seizure of Dabis objectively reasonable and we hold there was reasonable suspicion for an investigatory stop.

C.    **There was Probable Cause to Search the Vehicle.**

"Under the safeguards of the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution, all arrests and searches must be based upon probable cause." State v. Navas, 81 Hawai'i 113, 115-16, 913 P.2d 39, 41-42 (1996) (footnotes omitted). Thus, we must

18

determine whether, based on the totality of the circumstances, probable cause existed for the search of the vehicle which ultimately yielded the drugs and drug paraphernalia. We review this issue de novo. Id. at 123, 913 P.2d at 49.

"Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." Id. at 116, 913 P.2d at 42.

Here, as Officer Prudencio approached the sedan that Dabis was driving, it started moving forward towards Officer Prudencio. Officer Prudencio then drew his gun and pointed it at Dabis, whereafter the sedan reversed over the parking curb and went down an embankment before colliding into a utility pole. Officer Prudencio thus had probable cause to believe that a crime (i.e., reckless driving in violation of HRS § 291-2) had occurred. When Dabis could not produce a driver's license, there was probable cause to arrest Dabis for driving without a license in violation of HRS § 286-102(b).

Based on the totality of the circumstances at that point, the officers also had reasonable suspicion to conduct the canine drug screen of the sedan. The officers had all of the information that had supported the initial stop of Dabis for a drug investigation, plus his actions thereafter in moving his vehicle towards Officer Prudencio and then quickly reversing his vehicle over the curbing and down the embankment in an effort to flee. As stated by the Hawai'i Supreme Court, "although not dispositive, flight from the police is a factor which may support a finding of probable cause." State v. Melear, 63 Haw. 488, 494, 630 P.2d 619, 625 (1981) (citing Sibron v. New York, 392 U.S. 40, 66-67 (1968); United States v. Minor, 382 F. Supp. 203, n.1 (D.

Haw. 1974); <u>Franklin v. United States</u>, 382 A.2d 20 (D.C. App. 1978)).

We are therefore satisfied that there was probable cause to support the issuance of the search warrant. Although the information from the confidential informant(s) standing alone would not have established probable cause, that information was just one factor to be evaluated under the totality of the circumstances. The tip from the informant(s), the observations of Officer Prudencio at the scene, Dabis's actions in attempting to flee, and the positive alert to drugs by the canine screen together support probable cause sufficient for issuance of the search warrant.

## IV. CONCLUSION

We conclude that the police acted constitutionally in the initial investigatory stop of Dabis and in conducting the canine screen. We further conclude that the warrant issued to search the sedan was based on probable cause. Therefore, the circuit court did not err in denying Dabis's motion to suppress and we affirm the judgment of the circuit court.

DATED: Honolulu, Hawai'i, July 29, 2011.

Vaughan S. Winborne Jr.
for Defendant-Appellant

Jason Skier
Deputy Prosecuting Attorney
County of Hawai'i
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge